# 26-1532-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

MATT TAIBBI,

*Plaintiff-Appellant,*

*v.*

EOIN HIGGINS, BOLD TYPE BOOKS,
a division of Hachette Book Group, Inc.,

*Defendants-Appellees.*

*On Appeal from the United States District Court*
*for the Southern District of New York*

## BRIEF FOR PLAINTIFF-APPELLANT

Robert David Garson
GS2LAW PLLC
*Attorneys for Plaintiff-Appellant*
20801 Biscayne Boulevard, Suite 506
Aventura, Florida 33180
305-780-5212

PHP (212) 719-0990
appeals@phpny.com

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................1

ISSUES PRESENTED FOR REVIEW ..........................................................6

STATEMENT OF THE CASE........................................................................7

A. Jurisdiction and Timeliness ......................................................................7

B. Factual Background...................................................................................8

ARGUMENT ....................................................................................................19

I. Standard of Review ......................................................................................19

II. The District Court Erred in Ruling That Plaintiff Failed to State a Claim for Relief ..........................................................................20

A. Defamation ...........................................................................................20

B. The District Court Misapplied the Standard by Treating the Challenged Language Largely in Isolation ..................................22

C. The District Court Erred in Finding that the Defamatory Statements are not Actionable.........................................................25

D. The Amended Complaint Adequately Alleges Defamation by Implication.................................................................30

III. The Absence of Evidence Supporting the Alleged Financial Relationship Does Not Convert the Publication's Accusation Into Protected Opinion .......................................................................33

IV. The Alleged Accusation Directly Injures Taibbi in His Profession and Supports Defamation Per Se............................................35

CONCLUSION.................................................................................................37

CERTIFICATE OF COMPLIANCE................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Simon & Schuster, Inc.*,
85 N.Y.2d 373 (1995) ....5, 18, 20, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....19, 20

*Biro v. Condé Nast*,
807 F.3d 541 (2d Cir. 2015) ....19

*Biro v. Condé Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) ....30

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ....21

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ....30

*Cianci v. New Times Publishing Co.*,
639 F.2d 54 (2d Cir. 1980) ....28

*Crime Victims Center, Inc. v. Logue*,
181 A.D.3d 556 (2d Dep't 2020) ....28

*Davis v. Boeheim*,
24 N.Y.3d 262 (2014) ....*passim*

*Friedman v. Bloomberg L.P.*,
884 F.3d 83 (2d Cir. 2018) ....*passim*

*Gross v. New York Times Co.*,
82 N.Y.2d 146 (1993) ....4, 22, 34

*Herbert v. Lando*,
781 F.2d 298 (2d Cir. 1986) .......... 30

*Liberman v. Gelstein*,
80 N.Y.2d 429 (1992) .......... 35

*Mann v. Abel*,
10 N.Y.3d 271 (2008) .......... 21, 25

*Nielsen v. Rabin*,
746 F.3d 58 (2d Cir. 2014) .......... 6, 18

*Partridge v. State of New York*,
173 A.D.3d 86 (3d Dep't 2019) .......... 31, 32

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
53 F. Supp. 3d 705 (S.D.N.Y. 2014) .......... 23

*Silsdorf v. Levine*,
59 N.Y.2d 8 (1983) .......... 20, 27

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) .......... 21

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28 (1st Dep't 2014) .......... 32

*Thomas H. v. Paul B.*,
18 N.Y.3d 580 (2012) .......... 20, 27

**Statutes**

28 U.S.C. § 1291 .......... 7

28 U.S.C. § 1332(a) .......... 7

**Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................................7

Fed. R. Civ. P. 12(b)(6)..........................................................................................*passim*

## PRELIMINARY STATEMENT

Matt Taibbi has spent three decades building a career on the principle that an independent journalist answers to no one but the truth (Am. Compl. ¶ 12, A-7). He has won the National Magazine Award, the I.F. Stone Award for Independent Journalism, the Samizdat Prize, and the Integrity Media Award (Am. Compl. ¶ 12, A-7). He left a prestigious position at Rolling Stone to stake his livelihood entirely on reader-funded subscriptions through Substack, a model that succeeds only so long as the audience trusts the journalist's honesty and independence (Am. Compl. ¶ 12, A-7). In journalism, reputation is not an abstraction. For a subscription-dependent reporter, an accusation of financial corruption is an existential threat: it tells the audience that the product they are paying for, independent judgment, does not exist.

That is what the Book *Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left* does. Its front cover announces in bold type that Taibbi and others were "Bought" and "Owned" (Am. Compl. ¶ 13, A-7; Front Cover, A-5). Its jacket flaps place Taibbi within the "snug patronage of billionaires," identify him as one of their "cronies," assert that billionaires turned to media as an "investment and source of influence," and promise that the Book "follows the money" and "names names" (Am. Compl. ¶¶ 18–20, 24, A-9–10; Back Cover, A-8; Left Flap, A-9). The message to the bookstore browser, the airport reader, and the journalist's

subscriber is plain: Taibbi's reporting was financially induced, purchased, or controlled by wealthy patrons.

The record tells a very different story. Taibbi has never accepted money, employment, or inducements from Elon Musk or any other billionaire (Am. Compl. ¶ 14, A-7). He twice refused Musk's direct offers to monetize his content on Twitter, citing journalistic ethics (Am. Compl. ¶ 15, A-7). "If I did that," Taibbi wrote to Musk, "people would say I'm essentially an employee of Twitter and both of us would never hear the end of it," adding that "the optics would be really bad, journalistic ethics-wise" (Am. Compl. ¶ 43, A-15). Musk replied at once: "Then I guess it's goodbye" (Am. Compl. ¶ 43, A-15). Taibbi was then removed from the Twitter Files project, and his Twitter following was frozen and deamplified (Am. Compl. ¶ 45, A-15). Far from profiting, Taibbi experienced 4,844 subscriber cancellations and a $20,644 revenue loss during the heart of the Twitter Files project as readers grew frustrated that he was publishing his work for free on another platform (Am. Compl. ¶ 39, A-14). And in 2022, the very year the Book claims he "fully dispensed with any pretense of challenging power," Taibbi was in fact investigating and publishing damaging stories about the FBI, CIA, and Department of Homeland Security, work that led to the IRS visiting him during his congressional testimony (Am. Compl. ¶¶ 46–47, A-15–16).

Defendant Eoin Higgins has repeatedly conceded that the accusations his Book levels are unfounded. He admitted in an interview shortly after publication that readers "expecting" proof that journalists were "bought" would "be disappointed" (Am. Compl. ¶ 5, A-6). When podcaster Andrew Keen pressed him ("You are alleging there is a deal"), Higgins retreated to an "implicit understanding" in which a source would not have to tell a reporter how to report; "they would just know" (Am. Compl. ¶ 56, A-19). When asked to provide his best "smoking gun" evidence of financial corruption involving Taibbi, Higgins could offer none whatsoever, and instead pointed to a payment involving an entirely different journalist, Glenn Greenwald (Am. Compl. ¶¶ 68–69, A-21–22). The Book was not the product of an independent investigation that uncovered previously unknown facts; Higgins admits in the acknowledgments that he was "approached by Bold Type to write this book" (Am. Compl. ¶ 51, A-18). The narrative of corruption preceded any evidentiary inquiry.

The stakes of this case reach well beyond this lawsuit. The tactic of branding an ideological opponent as "bought" or "owned," stamping it on a book cover, and marketing the work as an investigative exposé that "follows the money" is a particularly dangerous form of political rhetoric because it wraps a factual accusation in the trappings of journalism. It tells the public not just that the author disagrees with Taibbi's conclusions, but that Taibbi's independence is a lie and his

reporting a product for sale. If accusations like these can be shielded from scrutiny at the pleading stage simply because the book that follows the cover fails to substantiate them, then any publisher can destroy a journalist's livelihood with a provocative cover and a fig leaf of opinion inside. The First Amendment protects vigorous debate; it does not immunize false accusations of professional corruption marketed as investigative fact.

The District Court dismissed this action after concluding that the challenged statements were nonactionable opinion or rhetorical hyperbole. The court recited the correct whole-communication standard but failed to apply it. New York law requires that whether language communicates actionable fact or protected opinion depends on the meaning conveyed by the communication as a whole. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153–56 (1993). Provocative or figurative language is not automatically protected where its context gives it a concrete and verifiable meaning. *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95–98 (2d Cir. 2018) (where the use of the word "extort" gave rise to the inference in a reasonable reader that the underlying lawsuit was frivolous and therefore susceptible to a defamatory meaning); *Davis v. Boeheim*, 24 N.Y.3d 262, 269–72 (2014) (where a reasonable reader could view statements as being supported by undisclosed facts, the plaintiff has sufficiently stated a cause of action).

The District Court acknowledged that otherwise nonactionable statements may collectively create actionable "false suggestions, impressions, and implications." A-112 (Order at 11, citing *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380–81 (1995)). But rather than evaluate the Book's title, cover, jacket, and related financial language as an integrated whole, the court separated the challenged statements and classified them one by one as rhetoric, opinion, or subjective commentary. A-109–14 (Order at 8–13). It analyzed "Owned" and "Bought" in isolation, then "snug patronage" separately as a reviewer comment, then "cronies" on its own as rhetorical hyperbole, then "follows the money" independently as not "of and concerning" Taibbi, and then "journalistic greed" standing alone as subjective. A-109–11 (Order at 8–10). The court then relied on the Book's own lack of evidence of any actual payment, contract, or quid pro quo involving Taibbi to reinforce its conclusion that the financial language was figurative rather than factual. A-110, A-112–13 (Order at 9, 11–12).

That reasoning turns the pleaded theory on its head. The absence of evidence supporting an asserted financial relationship does not convert the accusation into opinion; it demonstrates the falsity of the factual implication the publication prominently communicates. A cover that promises the reader investigative proof of financial corruption, and a book that delivers none, is not more protected because its accusation is unsupported. It is more damaging, because the accusation persists

while the reader's expectation of substantiation has been exploited and the journalist's reputation consumed.

At a minimum, the Book's title, cover, jacket, and related financial language are reasonably susceptible to the interpretation alleged in the Amended Complaint, namely, that Taibbi's journalism was financially induced, purchased, sponsored, or controlled by wealthy patrons. On a Rule 12(b)(6) motion, all reasonable inferences must be drawn in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). That competing reasonable inference should not have been resolved against Taibbi at the threshold.

The judgment should be reversed and the case remanded for further proceedings.

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in dismissing the complaint on the ground that the challenged statements were not actionable defamatory statements..
2. Whether the District Court erred in dismissing Taibbi's defamation-by-implication claim where the title, cover, jacket, and related statements, considered together, could reasonably convey and objectively endorse the implication that Taibbi's journalism had been financially purchased, sponsored, or controlled by billionaires.

3. Did the District Court err in failing to take into account the later admissions by author that the contents of the Book did not support the allegations on the cover.

## STATEMENT OF THE CASE

### A. Jurisdiction and Timeliness

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a). The Amended Complaint alleges that Taibbi is a citizen of New Jersey, that Higgins is a citizen of Maine, and that Bold Type Books is an imprint of Hachette Book Group, Inc., headquartered in New York. (Am. Compl. ¶¶ 7–11, A-6.) The amount in controversy exceeds $75,000, and the parties are citizens of different states. (Am. Compl. ¶¶ 10–11, A-6.)

On May 5, 2026, the District Court entered a Memorandum Decision and Order granting Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A-102–14. Final judgment disposing of all claims was entered on May 6, 2026. A-115. Taibbi timely filed his Notice of Appeal on June 2, 2026, within 30 days after entry of judgment. A-116–17; *see* Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the appeal is from a final judgment disposing of all claims.

## B. Factual Background

Matt Taibbi's Career and Professional Reputation

Matt Taibbi is a journalist and author who has spent more than three decades in independent journalism. (Am. Compl. ¶¶ 7, 12, A-6–7.) His father was a journalist, and Taibbi grew up immersed in the profession. (Am. Compl. ¶ 74, A-22.) He began his writing career in post-Soviet Russia and later joined Rolling Stone, where he gained national recognition reporting on Wall Street and the financial industry during the 2007–2008 crisis. (Am. Compl. ¶¶ 12–13, A-7; Order at 2, A-103.) His reporting has earned the National Magazine Award, the I.F. Stone Award for Independent Journalism, the Samizdat Prize, and the Integrity Media Award. (Am. Compl. ¶ 12, A-7.)

In 2020, Taibbi left Rolling Stone and began publishing independently through Substack, a subscription-based newsletter platform. (Am. Compl. ¶ 12, A-7; Order at 2, A-103.) He now relies exclusively on reader-funded subscriptions for his livelihood, a model that depends entirely on the audience's trust in the journalist's honesty and independence. (Am. Compl. ¶¶ 12–13, A-7.) The Amended Complaint alleges that Taibbi has never burned a source, broken a confidence, massaged a quote, or colored outside factual lines. (Am. Compl. ¶ 74, A-22.)

The Twitter Files

In 2022, Elon Musk purchased the social media platform Twitter (now known as X). (Am. Compl. ¶ 42, A-14–15; Order at 2, A-103.) Musk sought reporters to review internal company documents concerning, among other things, the platform's content-moderation decisions and communications with government actors. (Order at 2, A-103.) Taibbi was offered the opportunity to review these materials, commonly referred to as the "Twitter Files," on the condition that he publish his reporting on the platform. (Order at 2–3, A-103–04.)

Taibbi began publishing his Twitter Files reporting on December 2, 2022. (Order at 2, A-103.) Among other subjects, he reported on Twitter's decision to suppress a New York Post article concerning Hunter Biden's laptop in advance of the 2020 election and on the Trump Administration's requests that Twitter remove content. (Am. Compl. ¶ 58, A-19; Order at 2–3, A-103–04.)

The Amended Complaint alleges that the Book's characterization of the Twitter Files episode as evidence of Taibbi's corruption is the opposite of what actually occurred. (Am. Compl. ¶¶ 42–45, A-14–15.) In 2023, Musk asked Taibbi to leave Substack and move to a new "Twitter Subs" platform, promising that Taibbi would "get far more subscribers." (Am. Compl. ¶ 42, A-14–15; Order at 3, A-104.) Taibbi refused. He wrote to Musk: "If I did that, people would say I'm essentially an employee of Twitter and both of us would never hear the end of it," adding that

"the optics would be really bad, journalistic ethics-wise." (Am. Compl. ¶ 43, A-15; Order at 3, A-104.) Musk responded, "Then I guess it's goodbye." (Am. Compl. ¶ 43, A-15.) Taibbi alleges that after refusing Musk's offer, Musk immediately removed him from the Twitter Files project and his Twitter following was "frozen and deamplified." (Am. Compl. ¶ 45, A-15.)

The Amended Complaint further alleges that during the second and third months of the Twitter Files project, Taibbi experienced 4,844 subscriber cancellations and approximately $20,644 in lost revenue as readers grew frustrated that he was publishing his work for free on another platform. (Am. Compl. ¶ 39, A-14.) Only 13.7% of Taibbi's Substack subscribers joined after publication of his Twitter Files reporting, while 86.3% of his growth had come in the three and a half years before the project. (Am. Compl. ¶¶ 38–39, A-14.) Taibbi alleges he has never accepted money, employment, or inducements from Elon Musk or any other billionaire. (Am. Compl. ¶ 14, A-7.)

<u>The Book and Its Marketing Materials</u>

Defendant Eoin Higgins authored *Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left*, which Defendant Bold Type Books published on February 4, 2025. (Am. Compl. ¶ 1, A-4; Order at 1, A-102.) Higgins admits in the Book's acknowledgments that he was "approached by Bold Type to write this book." (Am. Compl. ¶ 51, A-18.)

The Book was marketed and published with integrated cover materials, including a front cover, back cover, spine, and jacket flaps, all of which were designed to be read by prospective purchasers and reviewers prior to purchase and independent of the Book's internal chapters. (Am. Compl. ¶ 16, A-7–8.) These materials repeatedly associate Taibbi with financial patronage and billionaire influence.

The front cover uses the words "Owned" and "Bought" and depicts puppeteer's strings, suggesting that journalists including Taibbi are puppets to billionaires. (Am. Compl. ¶¶ 3, 13, A-4, A-7; Front Cover, A-5.) The back cover describes "Glenn Greenwald and Matt Taibbi's decades-long journey from the world of alternative journalism into the snug patronage of billionaires" and states that this story has "profound and troubling implications for the future of journalism and unfettered thinking." (Am. Compl. ¶ 18, A-9; Back Cover, A-8; Order at 4, A-105.) The left jacket flap states that billionaires including Elon Musk, Peter Thiel, Marc Andreessen, and David Sacks "have turned to media as their next investment and source of influence" and identifies Greenwald and Taibbi as "[t]heir cronies." (Am. Compl. ¶ 20, A-10; Left Flap, A-9; Order at 4, A-105.) The same flap states that *Owned* "follows the money, names names, and offers a chilling portrait of a future social media and news landscape" and describes the Book as "a biting exposé of

journalistic greed, tech-billionaire ambition, and a lament for a disappearing free press." (Am. Compl. ¶¶ 24–25, A-10; Left Flap, A-9; Order at 4–5, A-105–06.)

Within the text of the Book itself, Higgins writes that Taibbi "spent decades building up credibility and credentials only to, in one high-profile moment, cash in to launder a CEO's cherry-picked corporate opposition file on his opponents." (Am. Compl. ¶¶ 13, 37, A-7, A-13; Book at 9, A-61; Order at 5, A-106.) The Book states that Taibbi's Substack "gained thousands of subscriptions" and that his Twitter Files reporting "generated a financial windfall." (Am. Compl. ¶ 37, A-13; Book at 186, A-61; Order at 5, A-106.) It further states that "It was this threat to Taibbi's bottom line that finally motivated the journalist to act" and that Taibbi "fully dispensed with any pretense of challenging power late in 2022." (Am. Compl. ¶¶ 45–46, A-15; Book at 196, 182, A-61; Order at 5–6, A-106–07.)

<u>Higgins's Post-Publication Admissions</u>

The Amended Complaint alleges that, following publication, Higgins made a series of admissions confirming that the Book's central accusations of financial corruption are unsupported.

In a February 2025 interview, Higgins stated that readers "expecting" proof that journalists were "bought" would "be a little disappointed because you can't really track decisions like this 100 percent to one thing alone." (Am. Compl. ¶ 5, A-6.) When podcaster Andrew Keen confronted Higgins on his February 7, 2025

podcast, telling him "You are alleging there is a deal" and asking him to explain it, Higgins responded that in Taibbi's case it was not a deal but an "implicit understanding" in which a source would not have to tell a reporter how to report because "they would just know," as in "you do this and you get benefit." (Am. Compl. ¶ 56, A-19.) When Keen asked Higgins to identify his best "smoking gun" evidence of financial corruption involving Taibbi, Higgins was unable to provide any, and instead pointed to a payment involving an entirely different journalist, Glenn Greenwald. (Am. Compl. ¶¶ 68–69, A-21–22.)

On an April 27, 2025 podcast appearance, Higgins conceded that "It's not like Matt Taibbi got selected by Elon Musk to do the Twitter Files and then went to the right," acknowledging that Taibbi's perceived shift was based on a "lot of factors," including "the nuance of getting older and having different politics and different experiences that change the way you think." (Am. Compl. ¶ 70, A-22.)

<u>The Interview Request</u>

On February 2, 2025, two days before publication, Higgins emailed Taibbi requesting an interview. (Am. Compl. ¶ 48, A-16–17; Order at 3, A-104.) Higgins framed the request as an opportunity to discuss "how [Taibbi's] audience changed and, more broadly, how [Taibbi] see[s] the left/right political landscape." (Am. Compl. ¶ 48, A-16–17; Order at 3, A-104.) Taibbi declined with the message, "Lol. Pass." (Am. Compl. ¶ 48, A-16–17; Order at 3, A-104.)

The Amended Complaint alleges that the email did not request comment on the Book's central accusations that Taibbi was "owned," "bought," operating under "patronage," or motivated by "journalistic greed," and that an invitation to discuss political audience dynamics is not a request for comment on an accusation of corruption. (Am. Compl. ¶¶ 48–49, A-16–17.)

The Amended Complaint

Taibbi commenced this action on November 13, 2025, and filed the operative Amended Complaint on February 3, 2026. (Order at 3–4, A-104–05.) The Amended Complaint asserts a single claim for defamation per se. (Am. Compl. ¶¶ 76–80, A-23.)

The Amended Complaint alleges that the statements on the Book's front cover, spine, back cover, and inside flaps are "independent defamatory publications" that "do not merely summarize the Book's contents but affirmatively assert new factual accusations of financial corruption and professional misconduct." (Am. Compl. ¶ 77, A-23; Order at 4, A-105.) The Amended Complaint identifies eleven specific statements as defamatory. The following statements appear on the Book's cover and jacket, as set forth in the Order at 4-5, with the language Taibbi highlights in bold: (Order at 4–5, A-105–06.)

1. "Owned." (Am. Compl. ¶ 17, A-9; Front Cover, A-5.)
2. "Bought." (Am. Compl. ¶ 13, A-7; Front Cover, A-5.)

3. "Glenn Greenwald and Matt Taibbi's decades-long journey from the world of alternative journalism into the snug patronage of billionaires is a story with profound and troubling implications for the future of journalism and unfettered thinking." (Am. Compl. ¶ 18, A-9; Back Cover, A-8.)
4. "In recent years, right-wing billionaires like Elon Musk, Peter Thiel, Marc Andreessen, and David Sacks have turned to media as their next investment and source of influence. Their cronies are Glenn Greenwald and Matt Taibbi ...." (Am. Compl. ¶ 20, A-10; Left Flap, A-9.)
5. "Owned follows the money, names names, and offers a chilling portrait of a future social media and news landscape." (Am. Compl. ¶ 24, A-10; Left Flap, A-9.)
6. "It is a biting exposé of journalistic greed, tech-billionaire ambition, and a lament for a disappearing free press." (Am. Compl. ¶ 25, A-10; Left Flap, A-9.)

The Amended Complaint also identifies the following statements from within the text of the Book:

7. "Taibbi's Twitter Files reporting is a perfect example: he spent decades building up credibility and credentials only to, in one high-profile moment, cash in to launder a CEO's cherry-picked corporate opposition file on his opponents." (Am. Compl. ¶¶ 13, 37, A-7, A-13; Book at 9, A-61.)

8. "His Twitter account blew up, and his Substack, already incredibly successful, gained thousands of subscriptions. The reporting generated a financial windfall for the writer, even if its findings were dismissed by more sober commentators." (Am. Compl. ¶¶ 13, 37, A-7, A-13; Book at 186, A-61.)
9. "His Substack had exploded after the Twitter Files reporting and he'd promised to continue exposing censorship of the social media site." (Am. Compl. ¶ 40, A-14; Book at 196, A-61.)
10. "It was this threat to Taibbi's bottom line that finally motivated the journalist to act." (Am. Compl. ¶ 45, A-15; Book at 196, A-61.)
11. "After years of confrontational commentary on the financial industry and questioning the mainstream, Taibbi fully dispensed with any pretense of challenging power late in 2022." (Am. Compl. ¶ 46, A-15; Book at 182, A-61.)

The Amended Complaint alleges that these statements are defamatory per se because they accuse Taibbi of corruption, dishonesty, and unethical conduct in his profession. (Am. Compl. ¶ 78, A-23.) It alleges that the statements, even where individually framed in rhetorical terms, operate together to convey the false and defamatory implication that Taibbi abandoned professional independence, concealed material facts, and aligned his journalism with the interests of billionaire patrons having been paid by them to do so. (Am. Compl. ¶ 27, A-11.)

The Amended Complaint alleges that Defendants acted with actual malice, pointing to: (1) Higgins's post-publication admissions that readers expecting proof of who was "bought" would be disappointed (Am. Compl. ¶¶ 5, 62, 65, A-6, A-20–21); (2) the Book's origin as a commissioned project with a predetermined thesis rather than an independent investigation (Am. Compl. ¶¶ 51–55, A-18–19); (3) Higgins's failure to disclose in his interview request that the Book would accuse Taibbi of financial corruption (Am. Compl. ¶¶ 48–49, A-16–17); (4) the disparity between the Book's marketing as an exposé that "follows the money" and its admitted lack of evidence of any financial transaction involving Taibbi (Am. Compl. ¶¶ 28–33, A-11–12); and (5) Hachette's failure to fact-check the Book (Am. Compl. ¶ 72, A-22). The Amended Complaint alleges damages in excess of $1,000,000. (Am. Compl. ¶ 80, A-23.)

<u>The Motion to Dismiss and Ruling Below</u>

Defendants moved to dismiss under Rule 12(b)(6) on February 17, 2026. (Order at 5-6, A-106–07.) Taibbi opposed on March 3, 2026, Defendants replied on March 16, 2026, and the District Court heard oral argument on March 25, 2026. (Order at 6, A-107.)

On May 5, 2026, the District Court granted the motion, dismissing the action solely on the ground that Taibbi failed to allege an actionable defamatory statement. (Order at 1, A-102.) The court did not reach actual malice.

The court's analysis proceeded statement by statement. It classified "Owned" and "Bought" as "attention-grabbing rhetoric" (Order at 8-9, A-109–10), "snug patronage" as "nonactionable opinion" (Order at 9, A-110), "cronies" as "rhetorical hyperbole" (Order at 9-10, A-110–11), "follows the money, names names" as not "of and concerning" Taibbi (Order at 10, A-111), "journalistic greed" as a "subjective determination" (Order at 10-11, A-111–12), "cash in" and "launder" as "figurative language" (Order at 12, A-113), "financial windfall" and "exploded" as subjective (Order at 12-13, A-113–14), and Taibbi's alleged motives and whether he "challenged power" as "matters of opinion" (Order at 13, A-114). In doing so, the court did not assess the meaning these statements convey when encountered together on the same book cover and jacket, notwithstanding that on a Rule 12(b)(6) motion all reasonable inferences must be drawn in the plaintiff's favor. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

The court acknowledged that otherwise nonactionable statements may collectively create actionable "false suggestions, impressions, and implications." (Order at 11, A-112, citing *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380-81 (1995).) But it then concluded that Taibbi had not shown Defendants "intended or endorsed" the defamatory inference. (Order at 11, A-112.) In reaching that conclusion, the court looked beyond the four corners of the Amended Complaint to the Book's internal suggestion that Taibbi's motivation was "to gain access" and to

Higgins's post-publication concession that readers expecting proof of who was "bought" would "be disappointed," treating those passages as distancing the Book from the defamatory implication. (Order at 11-12, A-112–13.) The court did not draw the competing inference in Taibbi's favor: that the cover's financial language communicates factual assertions about Taibbi's relationships with billionaire patrons, and that the Book's own failure to substantiate those assertions demonstrates their falsity rather than their figurative character. That inference was squarely pleaded in the Amended Complaint (Am. Compl. ¶¶ 27-33, A-11–12) and, at the motion to dismiss stage, was entitled to be accepted.

Judgment was entered on May 6, 2026. A-115.

## ARGUMENT

### I. Standard of Review

This Court reviews de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2018). At this posture, the Court is to "accept as true each and every allegation made by plaintiff and limit [its] inquiry to the legal sufficiency of plaintiff's claim." *Davis v Boeheim*, 24 NY3d 262, 268 (2014). To survive a motion to dismiss, "a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). Claims are plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**II. The District Court Erred in Ruling That Plaintiff Failed to State a Claim for Relief**

A. Defamation

"Where a plaintiff alleges that statements are false and defamatory, the legal question for the court on a motion to dismiss is whether the contested statements are reasonably susceptible of a defamatory connotation." *Armstrong v Simon & Schuster*, 85 NY2d 373, 380 (1995). "In making this determination, the court must give the disputed language a fair reading in the context of the publication as a whole." *Id.* "If, upon any reasonable view of the stated facts, plaintiff would be entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of action." *Silsdorf v Levine*, 59 NY2d 8, 12 (1983).

"Making a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation." *Thomas H. v Paul B.*, 18 NY3d 580, 584 (2012). In general, only facts can be deemed to be defamatory because opinions cannot be proven untrue. *Id.* Distinguishing between opinions and statements of fact is a difficult task for which this Court employs the following factors: "(1) whether the specific language in issue has a precise meaning which is

readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal … readers or listeners that what is being read or heard is likely to be opinion, not fact." *Mann v Abel*, 10 NY3d 271, 276 (2008).

Moreover, "… in distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose." *Brian v Richardson*, 87 NY2d 46, 51 (1995). The court should look to the context of the assertions as well as the larger context in which the statements were published, to determine whether a reasonable reader would believe the statements to convey libelous facts about the plaintiff. *Id.* at 51-52. "While a pure opinion cannot be the subject of a defamation claim, an opinion that 'implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, . . . is a 'mixed opinion' and is actionable.'" *Davis*, 24 NY3d at 269 (citing *Steinhilber v Alphonse*, 68 NY2d 283, 289 [1986]). Accordingly, the analysis of the factors employed by the Court are there to help determine whether the average reader could conclude that the statements conveyed facts about the plaintiff. *See id.*

### B. The District Court Misapplied the Standard by Treating the Challenged Language Largely in Isolation.

The District Court erred in its analysis of the defamatory statements, by analyzing them in isolation. (Order at 8–13, A-109–14). As stated above, the inquiry should focus on the impression the challenged language would convey to a reasonable reader in its full context. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153–56 (1993). Context is particularly important where a publication uses provocative or figurative terminology. A colorful word does not become protected opinion merely because it is capable of figurative use. In *Friedman v. Bloomberg L.P.*, this Court reversed the dismissal of a defamation claim based on an accusation that the plaintiff had "repeatedly tried to extort money," explaining that the statement, considered in context, was capable of conveying a concrete factual accusation and implying undisclosed facts. 884 F.3d at 95–98. Likewise, in *Davis v. Boeheim*, the New York Court of Appeals reversed dismissal where statements accusing plaintiffs of lying in an effort to obtain money were sufficiently specific and verifiable to constitute actionable fact or mixed opinion. 24 N.Y.3d at 269–72.

The same contextual analysis is required here. The challenged language is not a single stray epithet. The Book is entitled *Owned: How Tech Billionaires on the Right Bought the Loudest Voices on the Left*. A-5 (Am. Compl. ¶ 1, A-4; Front Cover, A-5). Its jacket describes Taibbi's entry into the "snug patronage of billionaires." A-8–9 (Am. Compl. ¶ 18, A-9; Back Cover, A-8). It explains that

billionaires turned to media as an "investment and source of influence" and identifies Taibbi as one of "[t]heir cronies." A-9, A-10 (Am. Compl. ¶ 20, A-10; Left Flap, A-9). It then tells the reader that the Book "follows the money" and "names names" and describes itself as an exposé of "journalistic greed." A-10 (Am. Compl. ¶¶ 19, 24–25, A-10; Left Flap, A-9; Order at 4–5, A-105–06). These statements repeatedly connect the same identified journalist with money, patronage, investment, influence, and greed.

The District Court addressed these statements principally one at a time. (Order at 8–11, A-109–12). It concluded that "*Owned*" and "Bought" were rhetorical, that "snug patronage" was imprecise, that "cronies" was hyperbole, that "follows the money" was not independently "of and concerning" Taibbi, and that "journalistic greed" was subjective opinion. A-109–12. But the question is not whether each phrase, standing alone, can be assigned a nondefamatory meaning. The question is what a reasonable reader could understand when those phrases are presented together as components of the same publication. See also *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 720–22 (S.D.N.Y. 2014) (rejecting a "piecemeal approach" to allegedly defamatory language and requiring consideration of the publication as a whole).

Nor does the fact that the Book discusses nonfinancial explanations for Taibbi's conduct eliminate the financial implication conveyed by the publication as

a whole. The relevant question is not whether every passage advances a single explanation, but whether the publication, viewed in context, is reasonably susceptible to the defamatory meaning alleged. Here, the title and jacket repeatedly frame Taibbi's relationship with billionaires in financial terms "Bought," "patronage," "investment," and "follows the money" while the Book itself also characterizes his reporting as producing a "financial windfall" and refers to a "threat to Taibbi's bottom line." A-13, A-15 (Am. Compl. ¶¶ 37, 45, A-13, A-15; Book at 186, 196, A-61). Those statements remain part of the communication a reasonable reader encounters and cannot be disregarded merely because the Book also discusses other motives or explanations.

Read together, the statements reinforce one another. "Bought" supplies the asserted transaction; "patronage" identifies the asserted relationship; "investment and source of influence" identifies its alleged purpose; "cronies" identifies Taibbi as a beneficiary or participant; and "follows the money" tells readers that the publication has traced the financial basis for that relationship. A-5, A-8–10 (Am. Compl. ¶¶ 17–20, 24, A-9–10; Front Cover, A-5; Back Cover, A-8; Left Flap, A-9). Whatever any one phrase might mean in isolation, their cumulative presentation is reasonably susceptible to the factual implication that wealthy patrons used financial benefits or inducements to obtain influence over Taibbi's journalism.

The District Court itself recognized that a publication may create actionable "false suggestions, impressions and implications" through the combined effect of otherwise nonactionable statements. (Order at 11, A-112). Having recognized that principle, the court should have applied it to the cumulative financial narrative alleged in the Amended Complaint rather than resolving each component separately.

At the pleading stage, Taibbi was not required to establish that his interpretation was the only possible reading of the publication. It was sufficient that the challenged language, viewed in its full context, was reasonably susceptible to the defamatory factual meaning alleged. See *Davis v Boeheim*, 24 NY3d 262, 271 (2014). Because it was, dismissal under Rule 12(b)(6) was improper.

### C. The District Court Erred in Finding that the Defamatory Statements are not Actionable

The District Court also erred in treating the Book's financial language as categorically rhetorical. (Order at 8–13, A-109–14.) First, the Court must determine whether the alleged statements are statements of fact using the three factors employed. *See Mann v Abel*, 10 NY3d 271, 276 (2008). The statements at issue here satisfy the first factor, "(1) whether the specific language in issue has a precise meaning which is readily understood," as the defamatory statements are easily comprehensible and their meaning discernible to the reasonable reader. Here, among the statements are "Owned"(Am. Compl. ¶ 17, A-9; Front Cover, A-5.); "Bought." (Am. Compl. ¶ 13, A-7; Front Cover, A-5.); "Glenn Greenwald and Matt Taibbi's

decades-long journey from the world of alternative journalism into the snug patronage of billionaires is a story with profound and troubling implications for the future of journalism and unfettered thinking." (Am. Compl. ¶ 18, A-9; Back Cover, A-8.); "In recent years, right-wing billionaires like Elon Musk, Peter Thiel, Marc Andreessen, and David Sacks have turned to media as their next investment and source of influence. Their cronies are Glenn Greenwald and Matt Taibbi ...." (Am. Compl. ¶ 20, A-10; Left Flap, A-9.); "Taibbi's Twitter Files reporting is a perfect example: he spent decades building up credibility and credentials only to, in one high-profile moment, cash in to launder a CEO's cherry-picked corporate opposition file on his opponents." (Am. Compl. ¶¶ 13, 37, A-7, A-13; Book at 9, A-61.); "It was this threat to Taibbi's bottom line that finally motivated the journalist to act." (Am. Compl. ¶ 45, A-15; Book at 196, A-61.). These statements were expressly included to convey the message advanced by the book, namely, that Matt Taibbi had been influenced by rich individuals to alter his journalism.

As to the second factor, these are certainly statements that can be proven true or false. In fact, when Higgins was asked about any evidence that gave rise to the conclusions he so willingly put forth, he acknowledged in a February 2025 interview, Higgins that readers "expecting" proof that journalists were "bought" would "be a little disappointed because you can't really track decisions like this 100 percent to one thing alone." (Am. Compl. ¶ 5, A-6.) The Court failed to take proper

regard of this damning admission. Higgins had to publicly explain that at the very least, the reasonable reader would believe that said statements are supported by facts that are available to the author and therefore constitute actionable statements. *Silsdorf v Levine,* 59 NY2d 8, 16 (1983) (holding that the statements made by defendant, including "Power tends to corrupt and absolute power corrupts absolutely", in the context made, are legally sufficient to assert a defamation claim).

Finally, the full context of the statement signals to the readers that what is being read is a fact and not merely opinion. Here, Eion Higgins, the author of the book at issue is a journalist and historian (A-36; Am. Compl. ¶ 8, A-6) who has appeared in various publications, including The New York Times, The Washington Post, and the New Republic, among others. He is therefore held to have a certain reputation and standard for the pieces of writing he authors. It is reasonable for any ordinary person who reads his materials, including the book at issue here, to interpret the contents to be factual or at the very least be supported by facts. *See e.g.*, *Thomas H. v Paul B.*, 18 NY3d 580, 586 (2012) (holding that the statements, in the context made, would be actionable even if they were couched in the form of an opinion rather than fact because "…a reasonable listener would have understood that defendants intended to label plaintiff as a child rapist.") Here, it is evident that Higgins at the very least intended to label Taibbi as biased journalism influenced by money.

As further illustration, in *Crime Victims Center, Inc. v. Logue*, the Second Department held that "bought off" a politician, receiving kickbacks, and using government funds to benefit an official, were actionable defamatory statements of fact. 181 A.D.3d 556, 557–58 (2d Dep't 2020). The phrase "bought off" was not treated as inherently rhetorical. In context, it conveyed an accusation of actual financial influence and corruption and were found to be actionable. *Id.* Additionally, in *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60 (2d Cir. 1980), this Court found an actionable statement of fact existed when a publication stated that the plaintiff had "managed to buy his way out of a possible felony charge." *Id.* at 61. This Court treated that language as capable of communicating factual misconduct and further recognized that the organization and sequencing of a publication could itself create a defamatory implication. *Id*. at 61–64.

*Owned* does not use the word "Bought" in a vacuum. The subtitle announces that tech billionaires "Bought the Loudest Voices on the Left." (Am. Compl. ¶ 13, A-7; Front Cover, A-5.) The jacket then identifies Taibbi by name, describes his entry into the "snug patronage of billionaires," characterizes billionaires' media involvement as an "investment and source of influence," labels Taibbi one of "[t]heir cronies," and tells readers that the Book "follows the money" and "names names." (Am. Compl. ¶¶ 18, 20, 24, A-9–10; Left Flap, A-9; Back Cover, A-8; Order at 4–5, A-105–06.) That surrounding language gives "Bought" and "Owned" a concrete,

verifiable referent: a reasonable reader could understand the publication to assert that identifiable billionaires conferred financial benefits on Taibbi and thereby obtained influence over his journalism. *See Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95–98 (2d Cir. 2018) (word "extort," though susceptible to figurative use, carried a defamatory factual meaning in context); *Davis v. Boeheim*, 24 NY3d 262, 270–72 (2014) (statements reasonably implying undisclosed factual basis are actionable).

The Book's own framing reinforces that reading. "Patronage" appears alongside "investment," "influence," and "money." The promise that the Book "follows the money" and "names names" goes further still: it represents to readers that the author has conducted an investigation tracing actual financial relationships. (Am. Compl. ¶¶ 24, 28–31, A-10–12.) Whether Taibbi was in fact paid, sponsored, or financially induced by the billionaires the Book identifies is provably true or false, and the Amended Complaint alleges it is false. (Am. Compl. ¶¶ 14, 26, 29, A-7, A-10–11.) This is not an isolated insult or generalized accusation of political bias; it is a unified factual narrative of financial corruption directed at a named journalist.

The District Court nevertheless concluded that "Bought" and "*Owned*" would naturally be understood metaphorically because the Book did not identify an actual payment, contract, or quid pro quo between Taibbi and Musk. (Order at 8–9, A-109–10.) But that absence does not compel a figurative interpretation. Whether Defendants actually possessed evidence substantiating that representation is distinct

from whether the representation itself could reasonably be understood as factual. Accordingly, because the publication is reasonably susceptible to that factual meaning, dismissal was improper.

### D. The Amended Complaint Adequately Alleges Defamation by Implication

New York recognizes a claim for defamation by implication where a publication creates "false suggestions, impressions and implications" even though the individual statements giving rise to the implication may not themselves be false. *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380–81 (1995). "A defamatory implication may be based on 'a combination of individual statements which in themselves may not be defamatory,' but which 'might lead the reader to draw an inference that is damaging to the plaintiff.'" *Biro v Condé Nast*, 883 F Supp 2d 441, 464 [SDNY 2012] (citing *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986)). To state a defamation by implication claim, the defamatory implication must be present and it must suggest that the author intends or endorses the inference. *Id.* (*citing Chapin v. Knight- Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993).

Taibbi satisfies both requirements.

First, the communication as a whole is reasonably susceptible to the alleged defamatory inference. The Book announces that tech billionaires "Bought" influential voices, identifies Taibbi as one of the journalists at issue, describes his entry into the "patronage of billionaires," identifies him as one of their "cronies,"

states that billionaires use media as an "investment and source of influence," and promises to "follow[] the money" and "name[] names." A-5, A-8–10 (Am. Compl. ¶¶ 17–20, 24, A-9–10; Front Cover, A-5; Back Cover, A-8; Left Flap, A-9.) Taken together, those statements reasonably permit the inference that Taibbi received financial benefits or inducements from billionaires and that those benefits influenced his journalism.

Second, the manner in which Defendants presented those statements affirmatively suggests endorsement of that inference. *Partridge v. State of New York* is instructive. 173 A.D.3d 86 (3d Dep't 2019). In this analysis, the Court will examine whether "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." *Id.* at 94 (citation omitted). In *Partridge*, the placement of the plaintiff's photograph among photographs of individuals associated with internet sex crimes was sufficient to convey and endorse the false implication that the plaintiff had been arrested for a similar offense, notwithstanding the existence of a small label identifying his actual charge. *Id.* at 91, 95. The presentation itself supplied the affirmative evidence of endorsement.

The same principle applies here. Defendants did not merely publish an isolated ambiguous phrase that a reader might happen to misunderstand. They

deliberately repeated and reinforced the alleged financial-influence narrative across the title, subtitle, cover, and jacket. “Bought,” “*Owned*,” “patronage,” “investment,” “influence,” “cronies,” and “follows the money” all point in the same direction. A-5, A-8–10 (Am. Compl. ¶¶ 17–20, 24, A-9–10; Front Cover, A-5; Back Cover, A-8; Left Flap, A-9.) The organization and repetition of those statements provide objective evidence that the publication endorses the financial implication they collectively convey.

The District Court nevertheless concluded that Taibbi had not alleged facts demonstrating that Defendants “intended or endorsed” the implication. A-112 (Order at 11). In reaching that conclusion, the court relied principally on the fact that the Book contained no evidence that Taibbi received payments, sponsorship, or financial inducement from Musk or another billionaire, and on allegations that Higgins acknowledged that readers expecting proof of who had been “bought” would be disappointed. A-110, A-112–13 (Order at 9, 11–12).

The District Court’s analysis misapplies Stepanov. Under *Partridge*, the relevant inquiry is not whether extrinsic evidence establishes Defendants’ subjective desire to communicate the defamatory implication. It is whether the communication itself, viewed objectively and as a whole, manifests endorsement of that meaning. 173 A.D.3d at 94–95. Here, the title and jacket themselves repeatedly present the alleged financial relationship as the subject of the Book and expressly promise to

"follow[] the money." Nor does the Book's failure to substantiate that accusation eliminate the implication created by its title and jacket. A publisher cannot necessarily avoid an implication conveyed by the prominent presentation of a publication simply because the body of the work later fails to prove the premise its cover announces.

At a minimum, the Amended Complaint plausibly alleges that the communication as a whole both conveys and endorses the defamatory implication that Taibbi's journalism was financially purchased or influenced by billionaires. The District Court therefore erred in dismissing the defamation-by-implication theory at the pleading stage.

## III. The Absence of Evidence Supporting the Alleged Financial Relationship Does Not Convert the Publication's Accusation Into Protected Opinion.

The District Court's reasoning on this point deserves to be stated plainly, because stating it plainly reveals the problem. The court observed that the Book contains no evidence that Taibbi received "payments, sponsorship, or financial inducement" from Musk or another billionaire (Order at 11–12, A-112–13). From that absence, the court concluded that words like "Bought," "patronage," and "cronies" must be figurative rather than literal.

In other words: the more baseless the accusation, the more protected it becomes. A book that titled someone "Bought," promised to "follow the money,"

and then *actually produced the receipts* would apparently be *more* vulnerable to a defamation claim than one that made the identical accusation and produced nothing. That cannot be right.

Had the cover of *Owned*, puppeteer strings, "follow the money, name names," Taibbi identified as a "crony" in the "snug patronage of billionaires," been published as a standalone poster, no one would call it protected opinion. Wrapping it around a 200-page book that fails to substantiate it does not make it less defamatory, it makes it *more* defamatory, because the accusation now arrives cloaked in the authority of a published investigation that concedes it cannot deliver on the cover's promise.

Defendants' own briefing confirms the absurdity. They told this Court that the Book "concludes that factors like age, personal politics, Gen X ethos, and scandal led to Taibbi affiliating with the Right," with financial benefits "at most a byproduct of his choices" (Defs.' Mem. at 1, A-34). The Book's thesis, then, is that Taibbi drifted rightward because he got older and had feelings about it, while the *cover* depicts him as a marionette dangling from a billionaire's strings. That is not a "fair index" of the contents. It is a defamatory false premise designed to sell books.

The law is clear: an accusation does not become opinion simply because the publisher fails to back it up. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153–56 (1993) ; *Davis v. Boeheim*, 24 N.Y.3d 262, 269–72 (2014); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95–98 (2d Cir. 2018). A reasonable reader encountering a book

that advertises itself as having "follow[ed] the money" does not assume the author is speaking figuratively, a reasonable reader assumes the author *found something*. When the author found nothing, that is not proof the accusation was rhetoric. It is proof the accusation was irresponsible.

The District Court conflated what the publication communicates with whether that communication is true. Taibbi alleges that the publication communicates a factual premise, that billionaires provided financial inducements influencing his journalism, and that this premise is false. The Book's failure to substantiate that premise is not evidence that no accusation was made, it is evidence the accusation was made without basis. A publication may not simultaneously promise to reveal how someone was "Bought," advertise that it will "follow the money," and then hide behind its own failure to deliver as proof that no reasonable reader took the promise seriously.

## IV. The Alleged Accusation Directly Injures Taibbi in His Profession and Supports Defamation Per Se.

New York recognizes defamation per se where a statement tends to injure a person in his trade, business, or profession. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435–36 (1992). The Amended Complaint alleges precisely that type of injury.

Taibbi's profession depends upon his credibility, independence, and integrity as a journalist. An assertion that a journalist was financially "Bought," entered the "patronage" of billionaires, became their "crony," and allowed money or financial

incentives to influence his reporting directly attacks the professional qualities on which a journalist's work depends. It is not merely criticism of Taibbi's political outlook or writing style; the alleged implication is that his purportedly independent journalism was compromised by financial influence.

The District Court dismissed the defamation-per-se claim only after concluding that Taibbi had failed to allege an actionable defamatory statement or implication. A-109–14 (Order at 8–13). If that threshold conclusion is reversed, the alleged professional accusation is sufficient to support per se actionability because it bears directly on Taibbi's fitness and integrity in his occupation.

The Court should therefore reverse the dismissal of the defamation-per-se claim and permit the action to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Matt Taibbi respectfully requests that this Court reverse the judgment of the District Court dismissing the Amended Complaint and remand the case for further proceedings.

Respectfully submitted,

**GS2LAW PLLC**
By: /s/ Robert Garson
Robert Garson
225 Broadway, Floor 37
New York, New York
10007
Tel: (212) 380-3623
rg@gs2law.com
Attorneys for Plaintiff-Appellant Matt Taibbi

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 8,248 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced, serif typeface using 14-point Times New Roman, with case names italicized.

*/s/ Robert Garson*
Robert Garson, Esq.